HOLT, Appellant,

v.

**GOOD SAMARITAN HOSPITAL AND HEALTH CENTER et al., Appellees.**

[Cite as *Holt v. Good Samaritan Hosp. & Health Ctr.* (1990), 69 Ohio App.3d 439.]

Court of Appeals of Ohio,
Montgomery County.

No. 11930.

Decided Sept. 18, 1990.

*Robert B. Coughlin* and *Larry A. Smith,* for appellant.

*James J. Gilvary, Thomas A. Knoth* and *John L. Green,* for appellees.

BROGAN, Judge.

Dr. Richard Holt brought suit against Good Samaritan Hospital and Health Center ("the hospital" or "Good Samaritan") and Samaritan Emergency Corporation ("S.E.C.") for allegedly revoking his medical staff privileges without the benefit of a hearing. The trial court sustained a motion for summary judgment in favor of the hospital and S.E.C. This matter is now before the court on Holt's timely notice of appeal from said judgment. Holt asserts three assignments of error, claiming that prior to the "limiting" of his privileges he was entitled to both procedural and substantive due process by contract, statute and common law. We find that Holt was not entitled to a hearing because S.E.C. entered into a valid contract with Good Samaritan to be the exclusive provider of emergency room services to the hospital. Therefore, the judgment of the trial court will be affirmed.

The facts surrounding this case are not in dispute. Good Samaritan is a private nonprofit hospital that for the last fifteen years has contracted with various private medical professional corporations to provide staff for the hospital's emergency room. Although the providers have changed over the years, the basic terms of the arrangement have remained the same. For the duration of the contract, Good Samaritan agreed that the private corporation would be the exclusive provider of services in the hospital's emergency room. Thus, in order to work in the emergency room, a physician had to be both a member of the Good Samaritan medical staff with privileges *and* be an employee of the provider corporation. Upon their expiration, the contracts were renewable at the option of both parties.

Good Samaritan entered into its first exclusive contract for emergency room services on June 6, 1975 with P.E.G. Upon expiration of its agreement with P.E.G., Good Samaritan entered into an exclusive contract with Dayton Regional Emergency Physicians Association, Inc. ("Dayton Regional") on June 6, 1978. Good Samaritan renewed its exclusive contract with Dayton Regional on November 7, 1980.

On August 11, 1983, Holt received conditional privileges at Good Samaritan. Since he practiced in the emergency room, Holt became an employee of Dayton Regional. Holt's status was upgraded to associate staff member on March 5, 1984, and he continued to be employed by Dayton Regional.

Holt then formed his own corporation, West Central Ohio Emergency Medicine Association ("WCOEMA"). Holt was both the founder and an employee of WCOEMA. When Dayton Regional's contract expired, WCOEMA was able to become the new exclusive provider for Good Samaritan on July 1, 1984. Holt was then elevated to active staff status on August 1, 1985.

WCOEMA renewed its exclusive contract with Good Samaritan on July 1, 1986.

WCOEMA's contract was to expire on July 1, 1989. Holt, on behalf of WCOEMA, entered into negotiations with Good Samaritan regarding renewal of the exclusive contract, but was unsuccessful. On June 6, 1989, Good Samaritan notified Holt that S.E.C. would become the new exclusive provider and that, like all other current employees of WCOEMA, he would no longer be able to provide services in its emergency room unless he became an employee of S.E.C. Holt refused to affiliate himself with S.E.C., which was paying its physicians only $60 per hour instead of $80 per hour as WCOEMA had paid. Therefore, when S.E.C. became the exclusive provider on July 1, 1989, Holt was not allowed to work in the emergency room. No hearing was held because no formal action was ever taken by Good Samaritan to revoke or reduce Holt's privileges. Holt technically retained his privileges and remained a member of the hospital's medical staff; he was just unable to practice in the emergency room because he was not an employee of S.E.C.

Holt filed for an injunction to reinstate his access to Good Samaritan's emergency room and for money damages for his lost income, pursuant to R.C. 3701.351(D). The trial court sustained Good Samaritan's and S.E.C.'s motion for summary judgment. Holt now appeals.

For his first assignment of error, Holt asserts that:

"Under Ohio law and by contract Dr. Richard L. Holt was entitled to the benefits of procedural due process before his privilege to practice medicine in the emergency department of Good Samaritan Hospital was terminated or rendered unexercisable."

The gist of Holt's argument is that he was entitled to a hearing in front of the hospital's medical board before his privileges were "limited" by the exclusive contract with S.E.C. Holt points to three sources for this entitlement: the common law, R.C. 3701.351(B), and contractual obligations allegedly created by the bylaws of Good Samaritan. We will address each of these contentions in turn.

Courts have long held that physicians are entitled to procedural due process before a hospital may *revoke* their staff privileges. *Khan v. Suburban Community Hosp.* (1976), 45 Ohio St.2d 39, 74 O.O.2d 56, 340 N.E.2d 398. Holt argues that this standard is broader, and that he was entitled to procedural due process before Good Samaritan took any action that would "adversely affect" his privileges. However, none of the cases Dr. Holt has cited extends the due process protections this far. We do not reach this issue, however, because we find that even if *Khan* were applicable to situations

where privileges have not been revoked but merely "adversely affected," the existence of the exclusive contract precluded the necessity of a hearing in the case at bar.

The Supreme Court has held that:

"The board of trustees of a private hospital has broad discretion in determining who shall be permitted to have staff privileges. Courts should not interfere with the exercise of this discretion unless the hospital has acted in an arbitrary, capricious or unreasonable manner or, in other words, has abused its discretion." *Bouquett v. St. Elizabeth Corp.* (1989), 43 Ohio St.3d 50, 538 N.E.2d 113, paragraph one of the syllabus.

Thus, the question before us is: Did Good Samaritan abuse its discretion when it entered into an exclusive contract with S.E.C. without providing a hearing to all physicians who might be "adversely affected" by this contract? We respond in the negative.

Holt does not dispute that it is common practice for most hospitals today to enter into exclusive contracts with medical professional corporations to provide certain services, particularly in emergency rooms, radiology, and pathology labs. The Court of Appeals for Franklin County has recognized that such exclusive contracts are valid and enforceable. *Williams v. Hobbs* (1983), 9 Ohio App.3d 331, 9 OBR 599, 460 N.E.2d 287. This is in accord with the rulings of numerous foreign jurisdictions. *Redding v. St. Francis Medical Ctr.* (1989), 208 Cal.App.3d 98, 255 Cal.Rptr. 806; *Tomlinson v. Humana, Inc.* (Ala.1986), 495 So.2d 630; *Brandon v. Combs* (Ky.1983), 666 S.W.2d 755; *Radiology Professional Corp. v. Trinidad Area Health Assn.* (1978), 195 Colo. 253, 577 P.2d 748; *Harron v. United Hosp. Ctr., Inc.* (C.A.4, 1975), 522 F.2d 1133; *Dattilo v. Tucson Gen. Hosp.* (1975), 23 Ariz.App. 392, 533 P.2d 700; *Adler v. Montefiore Hosp. Assn.* (1973), 453 Pa. 60, 311 A.2d 634; *Rush v. St. Petersburg* (Fla.1967), 205 So.2d 11; *Benell v. Virginia* (1960), 258 Minn. 559, 104 N.W.2d 633.

Many of these foreign jurisdictions have directly addressed Holt's argument that he had a common-law right to a hearing before Good Samaritan entered into an exclusive contract. Illustrative of this line of cases is a holding by a California court of appeals:

"Although most of the reported cases deal primarily with 'fair procedure' problems in relation to adjudicatory decisions, there can be no doubt that, because denial of staff membership may effectively impair a physician's right fully to practice his profession, neither a private nor public hospital may unreasonably or arbitrarily exclude a physician otherwise qualified from membership on its staff. However, it does not necessarily follow that the governing authority of a hospital may not make a policy decision or adopt a

rule of general application that certain facilities shall be operated by the hospital itself through an arrangement with one or more physicians to the exclusion of all members of the staff except those who may be coincidentally employed in such operation. Indeed, in every case brought to our attention in which a hospital's operation of a facility on a 'closed-staff' basis was challenged, the decision of the governing authority of the hospital has been upheld." *Lewin v. St. Joseph Hosp.* (1978), 82 Cal.App.3d 368, 391, 146 Cal.Rptr. 892, 906–907.

We also agree with the Maryland Court of Special Appeals that the rationale which provides a physician with procedural due process rights is simply inapplicable where an exclusive contract is involved:

"It seems clear to us that this procedure presupposes notification to the practitioner that he has failed in his duties to the Hospital, his patients, or in the competent practice of medicine. Obviously a doctor faced with charges of this kind must be given a due process opportunity to defend himself. The case here at bar, however, does not fit into that category * * *. Appellees, concede that the Hospital had a legal right to enter into an exclusive contract with Friedman and his professional association to provide the services required to implement the newly formed Department of Imaging. It necessarily follows that under these circumstances the Hospital had no obligation to grant privileges to radiologists who might compete with the Friedman Association. * * *

"* * *

"* * * No suggestion is made that the radiologists were in any way incompetent or failed to conduct themselves properly while their contract with the Hospital was in effect. There is nothing to defend [at any proposed hearing]. The facts are that an exclusive contract with Frazier P.A. has expired and a new exclusive contract has been negotiated with Friedman's P.A. * * *" *Anne Arundel Gen. Hosp., Inc. v. O'Brien* (1981), 49 Md.App. 362, 371–373, 432 A.2d 483, 488–489.

Likewise, in the instant case no one has accused Holt of performing his professional duties with anything but the utmost competence. While Holt is prevented from providing services in Good Samaritan's emergency room because of his refusal to associate himself with S.E.C., neither his professional reputation nor his ability to practice medicine in general is in any way placed in jeopardy by the hospital's actions. Holt retains his privileges and ability to practice in four hospitals other than Good Samaritan. While Holt has a constitutionally protected right to practice medicine, he does *not* have a right to practice in any *particular hospital. Gotsis v. Lorain Community Hosp.* (1974), 46 Ohio App.2d 8, 17, 75 O.O.2d 18, 22, 345 N.E.2d 641, 646.

We agree with Good Samaritan and S.E.C. that if Holt's arguments were to prevail, it would be the death knell of exclusive contracts for medical services. Once having entered into a contract with a provider corporation, a hospital would be locked into continuing the association until the unlikely event that every member physician either ceased practicing medicine or lost his privileges due to incompetency. We will not substitute our judgment for that of hospital boards throughout the nation, by removing a managerial option that has been universally acknowledged as valid and beneficial to the efficient administration of health care.

Holt also claims a statutory right to a hearing by virtue of R.C. 3701.351, which reads in pertinent part:

"(A) The governing body of every hospital shall set standards and procedures to be applied by the hospital and its medical staff in considering and acting upon applications for staff membership or professional privileges. These standards and procedures shall be available for public inspection.

"(B) The governing body of any hospital, in considering and acting upon applications for staff membership or professional privileges within the scope of the applicants' respective licensures, shall not discriminate against a qualified person solely on the basis of whether such person is certified to practice medicine or osteopathic medicine, or podiatry, or dentistry."

It is uncontroverted that Good Samaritan did create "standards and procedures" in accordance with subsection (A). However, nowhere in these procedures is there a requirement for a hearing before entering into an exclusive contract.

In support of his position, Holt cites the Supreme Court's pronouncement that "R.C. 3701.351 prohibits a hospital from adopting standards for staff membership or clinical privileges that are not reasonably related to accepted measures of skill, education and competence." *Dooley v. Barberton Citizens Hosp.* (1984), 11 Ohio St.3d 216, 11 OBR 532, 465 N.E.2d 58, syllabus. Thus, Holt argues, Good Samaritan cannot enter into an exclusive contract without first providing him with a hearing, since it would "adversely affect" his privileges for reasons other than his skill, education, or competence. We do not read *Dooley* in the same way.

*Dooley* dealt with discrimination by a hospital against podiatrists. After stating the proposition that became the syllabus quoted by Holt, the Supreme Court went on to state:

"In making this holding we make no sudden departure from prior Ohio case law but rather embrace the 'rule of reason' in conjunction with a heightened scrutiny of rules which affect staff membership or clinical privileges *for those*

*professional practitioners delineated in R.C. 3701.351."* (Emphasis added.) *Id.* at 222, 11 OBR at 537, 465 N.E.2d at 64.

Thus, *Dooley* is clearly limited to preventing discrimination based upon a physician's classification. The classifications delineated in the statute are osteopaths, podiatrists, and dentists. However, Holt is not claiming that his privileges were "adversely affected" because he is an osteopath. Therefore, *Dooley* is not controlling.

Cases subsequent to *Dooley* make it clear that the Supreme Court did not intend the syllabus to be taken as a blanket statement applicable outside of the classification discrimination context. In the later case of *Bouquett, supra,* the Supreme Court held that a doctor could summarily lose his privileges because of the "perceived integrity of a physician which becomes suspect after he has been convicted of a felony," which is a reason which *"encompasses more than* technical skills and professional competence." (Emphasis added.) *Id.* at paragraph two of the syllabus. Thus, the *Dooley* syllabus does not present an exclusive list of bases for revoking privileges.

In this context, R.C. 3701.351 provides Holt with no more procedural due process rights than he has at common law. The statute does not contemplate exclusive contracts, and we will not construe it to thwart their use.

Holt's final argument is that he is contractually entitled to a hearing by Good Samaritan's bylaws. We do not agree.

██ We note as a threshold matter that staff bylaws constitute a binding contract "only where there can be found in the bylaws an intent by both parties to be bound." *Munoz v. Flower Hosp.* (1985), 30 Ohio App.3d 162, 30 OBR 303, 507 N.E.2d 360, syllabus. The record does not indicate an intent by either party to be bound. However, since this is a factual determination and this matter has reached us by way of summary judgment, we will assume *arguendo* that the Good Samaritan bylaws do constitute a binding contract.

The Court of Appeals for Franklin County has held that "the Board of Trustees of a hospital, *notwithstanding the operation of any regulations of the hospital to the contrary,* may terminate the privileges of a physician in the radiology department of the hospital who has been expelled from membership in a group practice corporation which has an exclusive contract with the hospital to provide all radiology services." (Emphasis added.) *Williams, supra,* 9 Ohio App.3d at 331–332, 9 OBR at 599–600, 460 N.E.2d at 289–290. The trial court based its decision in the instant case on *Williams.* We concur.

Nothing in the bylaws makes provision for a hearing before the hospital enters into an exclusive contract. Bylaws 9.1.1(j) and (*l*) give a doctor a right to a hearing before his privileges are reduced or revoked, respectively.

However, Holt's privileges have not been reduced or revoked. He is still a member of the medical staff with all of the same privileges that he enjoyed before S.E.C. became the exclusive provider of emergency services. Holt fails to appreciate the difference between his privileges and his ability to provide services in a "closed" emergency room. The dichotomy was explained best by the Seventh Circuit Court of Appeals, which stated:

"Dr. Collins also asserts that St. John's [Hospital] wrongfully removed or reduced his staff privileges in violation of the by-laws of the hospital. However, the record reflects that St. John's has neither removed nor reduced Dr. Collins' staff privileges * * *. Staff privileges reflect the hospital's decision that a physician is qualified to practice in the facility, but do not in and of themselves confer employment. Employment as a pathologist at St. John's was determined by the legal contract between St. John's and APL [the exclusive contractor] * * *. Although without concurrent employment by St. John's as a pathologist these staff privileges may be of little or no value to Dr. Collins, the fact remains that the privileges were neither removed nor reduced. We affirm the grant of summary judgment." *Collins v. Associated Pathologists, Ltd.* (C.A.7, 1988), 844 F.2d 473, 481.

In the absence of an express provision in the bylaws to the contrary, we see no reason why a private hospital should hold hearings before entering into a contract with a private corporation.

We are also not persuaded by Holt's argument that since he had some limited privileges before either of the WCOEMA contracts was entered into he should be "grandfathered" into the S.E.C. contract. At all times that he provided emergency room services Holt was employed by whoever was the current exclusive contractor. For Holt's argument to even be considered by this court his privileges would have to predate the first exclusive contract that Good Samaritan entered into with P.E.G. in 1975, which they do not.

Holt's first assignment of error is found to be not well taken.

Holt argues his second and third assignments of error together. We will do likewise.

"II. Dr. Holt was entitled to substantive due process in the form of a fair and impartial hearing wherein a determination was made by the medical executive committee as to whether Dr. Holt's privilege to practice medicine in the emergency department of Good Samaritan Hospital was terminated or rendered unexercisable because of the award of an exclusive contract to [S.E.C.].

"III. Dr. Holt was entitled to substantive due process in the form of a fair and impartial hearing wherein a determination was made by the medical

executive committee of whether Dr. Holt's privilege to practice medicine in the emergency department was terminated or rendered unexercisable for reasons which relate to his skill, education and competence and quality patient care."

As an initial matter we note that we fail to see how Holt has any substantive due process rights at issue when all parties are undoubtedly private entities and not state actors. Be this as it may, we will briefly address the contentions presented.

Holt claims that his substantive due process rights were violated since his privileges were "adversely affected" for reasons other than those specified in Bylaw 3.2.3, which reads:

"Medical Staff membership or particular clinical privileges shall not be denied on the basis of age, sex, race, creed, color, or national origin or on the basis of any other criterion unrelated to the delivery of quality patient care in the hospital, to professional ability and judgment, or to community need."

This argument suffers from several fatal flaws. First, Bylaw 3.2.3 is clearly a nondiscrimination clause analogous to R.C. 3701.351, and for the same reasons as the statute is not applicable to the case at bar. Second, it is far from certain that these bylaws have any binding effect. *Munoz, supra.* Third, Holt's privileges have not been revoked, so his substantive rights cannot have been abridged. *Collins, supra.* Fourth, any substantive rights that he might have are no more extensive than his common-law rights to due process, and as discussed above, these do not prevent the execution of exclusive contracts.

Contrary to Holt's assertions, Good Samaritan need not hold a hearing to establish that its decision to award the exclusive contract to S.E.C. instead of WCOEMA was not arbitrary, unreasonable, or capricious. This is a business decision that no court is in a position to second-guess without sufficient constitutional or statutory justifications. The only possible issues at any such hearings would be whether S.E.C. in fact has an exclusive contract, and whether Holt is an employee of S.E.C. *Poszgay v. Southwestern Illinois Health Facilities, Inc.* (Feb. 16, 1989), S.D.Ill. Case No. 88–3489, unreported. Since these issues are uncontested, a hearing would be a futile act.

All of Holt's assignments of error having been found to be not well taken, the judgment of the trial court will be affirmed.

*Judgment affirmed.*

WOLFF, P.J., and FAIN, J., concur.